UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                 :

In re:                         :        Chapter 11
                                 :

SUNEDISON, INC., *et al.*,    :        Case No. 16-10992 (SMB)
                                 :

           Debtors.      :        (Jointly Administered)

-------------------------------------------------------X

SMP LTD.,                  :        Adv. Proc. No. 17-01057 (SMB)
                                 :

          Plaintiff,      :
                                 :

          -against-      :
                                 :

SUNEDISON, INC.,         :
                                 :

          Defendant,    :
                                 :

          and            :
                                 :

GCL-POLY ENERGY HOLDINGS LIMITED  :
                                 :

        Defendant-Intervenor.   :

-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING GCL-POLY ENERGY HOLDINGS LIMITED'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING SMP LTD.'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

CLEARLY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

      Lisa M. Schweitzer, Esq.
      Jane VanLare, Esq.
         Of Counsel

*Attorneys for SMP Ltd.*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

Jay M. Goffman, Esq.
J. Eric Ivester, Esq.
James J. Mazza, Jr., Esq. (admitted *pro hac vice*)
Louis S. Chiappetta, Esq. (admitted *pro hac vice*)
Robert A. Weber, Esq. (admitted *pro hac vice*)
  Of Counsel

*Attorneys for SunEdison, Inc.*

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

Michael A. Rosenthal, Esq.
Marshall R. King, Esq.
Matthew G. Blouslog, Esq. (admitted *pro hac vice*)
  Of Counsel

*Attorneys for GCL-Poly Energy Holdings Limited*

   The plaintiff, SMP Ltd. ("SMP")—a debtor under Korean bankruptcy law—sued

the defendant SunEdison, Inc. ("SunEdison")—a U.S. debtor—seeking a declaratory

judgment under Count I of its *Complaint*, dated May 1, 2017 ("*Complaint*") (ECF Doc.

#1)[1] that SunEdison's termination of a September 28, 2011 supply and license

agreement (the "SLA") was invalid because the termination violated Korean insolvency

law.  The defendant-intervenor GCL-Poly Energy Holdings Limited ("GCL") purchased

certain of SunEdison's assets in bankruptcy and is the ultimate party in interest

concerning the validity of the termination.  GCL moved for partial judgment on the

pleadings or, alternatively, partial summary judgment validating SunEdison's

termination of the SLA, (*see Defendant-Intervenor GCL Poly Energy Holdings

Limited's Brief in Support of its Motion for Partial Judgment on the Pleadings or, in

the Alternative, for Partial Summary Judgment*, dated July 31, 2017 ("*GCL Motion*")

---

[1]  "ECF Doc. # ___" refers to documents filed on the docket of this adversary proceeding.  "ECF Main
Case Doc. # ___" refers to documents filed in the SunEdison chapter 11 case.

(ECF Doc. # 18)), and SMP cross-moved for partial summary judgment urging the opposite result.  (*See Memorandum of Law (I) in Opposition to Defendant-Intervenor GCL-Poly Energy Holdings Limited's Motion for Partial Summary Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment, and (II) in Support of SMP Ltd.'s Cross Motion for Partial Summary Judgment*, dated Aug. 14, 2017 ("*SMP Motion*") (ECF Doc. # 28).)

The impetus driving the parties' disagreement revolves around the difference between the termination and the rejection of the SLA.  SunEdison licensed certain intellectual property to SMP under the SLA.  If SunEdison's termination was valid, SMP can no longer use the intellectual property.  If, however, SunEdison is limited to rejecting the SLA, SMP can continue to use SunEdison's intellectual property without its consent.  *See* 11 U.S.C. § 365(n)(1)(B).  For the reasons that follow, the Court concludes that the termination of the SLA was valid.  Accordingly, GCL's motion for partial summary judgment is granted, and SMP's cross-motion is denied.

## BACKGROUND

The parties have stipulated to the pertinent facts, (*see Stipulation of Undisputed Facts Pursuant to Local Bankruptcy Rule 7056-1*, dated July 31, 2017 (the "Fact Stipulation")[2] (ECF Doc. # 21)), relevant to Count I.

---

[2]    References to paragraphs in the Fact Stipulation will be denoted as "(¶ _.)"

## A.        Formation of SMP and the SLA

This litigation concerns a plant built in Ulsan, Korea (the "Plant") to manufacture polycrystalline silicon, also known as "polysilicon," a vital material used in the production of solar wafers for solar cells.  (¶ 1.)  In 2011, SunEdison Products Singapore Pte. Ltd. ("SunEdison Singapore") and Samsung Fine Chemicals Ltd. ("SFC," and collectively with its affiliates, "Samsung") formed SMP as a joint venture under the laws of the Republic of Korea to ensure a supply of polysilicon in Korea.[3]  (¶ 4.)  The parties' Joint Venture Agreement, dated Feb. 15, 2011, contemplated, *inter alia*, that (a) SunEdison Singapore or its affiliate would license to SMP the technology necessary for SMP to build and operate a polysilicon manufacturing plant, and (b) polysilicon products manufactured by SMP would be sold only to SunEdison Singapore and SFC.  (¶ 7.)  SunEdison relied on SFC to contribute employees to the joint venture, secure financing, provide land within an existing Samsung industrial complex on which to build the Plant, and provide supplies (*e.g.*, electricity, argon, nitrogen, water, etc.) to the extent available to SFC at favorable rates.  (¶ 10.)  SunEdison contributed the technology, equipment, Plant design, and certain knowledge, and provided training to SMP's employees so they could manufacture polysilicon at the Plant.  (¶ 11.)  The manufacture of polysilicon at the Plant is SMP's sole business, the Plant is not presently operating, (¶ 5), and SMP does not have any other business or operations.  (¶ 12.)

In connection with the joint venture, and among other things, SunEdison and SMP entered into the SLA.  (¶ 14.)  Among other things, SunEdison granted SMP a

---

[3]        Initially, SFC and SunEdison Singapore each held 50% of SMP's equity, but SunEdison Singapore currently owns 62.25%.  (¶ 4.)

license to use certain polysilicon production technology to install, operate and maintain the equipment at the Plant and to design, construct, operate and maintain the Plant. The SLA contains two provisions crucial to the current dispute.  (¶ 15.)  First, section 8.2(a)(ii) includes an *ipso facto* clause (the "Ipso Facto Clause") that permits either party to terminate the SLA if the other, *inter alia*, files bankruptcy or is unable to pay its debts as they become due.[4]  (¶ 21.)  Second, section 11.9 selects New York and U.S. federal law as the governing law, without regard to their conflict of laws principles.[5]  (¶ 22.)

## B.   The Bankruptcy Proceedings

SMP began a shut-down process for the Plant in March 2016 and completed the shut-down in April 2016.  (¶ 30.)  On April 21, 2016, SunEdison, SunEdison Singapore, and certain affiliates (the "SunEdison Debtors") each commenced bankruptcy cases

---

[4]     Section 8.2(a)(ii) states:

(a)     This Agreement may be terminated by either Party upon written notice to the other Party:

. . .

(ii)  If (A) such other Party, any of its creditors or any other eligible party files or commences a proceeding for liquidation, bankruptcy, receivership, reorganization, rehabilitation, composition or dissolution of such other Party (and, in the case of any such proceeding brought against such other Party, such proceeding has not been stayed or dismissed within ninety (90) days after the filing thereof), or (B) such other Party is unable to pay or has suspended payment of its debts generally as they become due (except debts being contested in good faith), or (C) the creditors of such other Party have taken over its management, or (D) the relevant financial institutions have suspended the clearing house privileges of such other Party.

[5]     Section 11.9 states:

The validity of this Agreement, the construction and enforcement of its terms and the interpretation of the rights and duties of the Parties hereunder shall be governed by the laws of the State of New York and the Federal laws of the United States applicable thereto without giving effect to the conflicts of laws principles thereof.  This Agreement is not subject to the United Nations Convention on Contracts for the International Sale of Goods.

under chapter 11 of the Bankruptcy Code.  (¶ 30.)  Two weeks later, on May 3, 2016,
SMP filed an application for rehabilitation under the Republic of Korea's Debtor
Rehabilitation and Bankruptcy Act ("DRBA") with the 21st Civil Division of the Ulsan
District Court (the "Korean Bankruptcy Court").  On June 13, 2016, the Korean
Bankruptcy Court issued an order (the "Commencement Order")[6] commencing the
proceeding (the "Korean Bankruptcy Proceeding"), which remains pending in the
Korean Bankruptcy Court.  (¶ 31.)  The Commencement Order appointed SMP's
representative director to act as the "custodian," and fixed certain schedules relating to
the filing and inspection of claims and the filing of a rehabilitation plan, but did not
expressly grant any relief to SMP such as a stay of creditor actions.  As of the date of the
commencement of the Korean Bankruptcy Proceeding, the SLA was an executory
contract in full force and effect.  (*See* ¶¶ 32, 34.)  SunEdison, SunEdison Singapore and
MEMC Pasadena, Inc., another SunEdison Debtor, each filed a proof of claim against
SMP in the Korean Bankruptcy Proceeding.  (¶ 33.)

On August 26, 2016, the SunEdison Debtors filed a motion (the "Sale Motion")
for an order approving, *inter alia*, the sale of their solar materials business,[7] which
included their assets pertaining to SMP.  GCL acted as the stalking horse bidder for the

---

[6]    A copy of the Commencement Order translated into English is attached as Exhibit B to the
*Declaration of Marshall R. King in Support of Defendant-Intervenor's Motion for Partial Judgment on
the Pleadings or, in the Alternative, for Partial Summary Judgment*, dated July 31, 2017 (ECF Doc. # 19).

[7]    *See Debtors' Motion For (I) An Order (A) Approving The Bidding Procedures For The Sale Of
The Solar Materials Business, (B) Establishing The Notice Procedures And Approving The Form And
Manner Of Notice Thereof, (C) Approving Procedures For The Assumption And Assignment Of Certain
Executory Contracts And Unexpired Leases, (D) Scheduling A Sale Hearing, And (E) Granting Related
Relief And (II) An Order (A) Approving The Sale Of The Solar Materials Business Free And Clear Of All
Liens, Claims, Encumbrances, And Other Interests, (B) Approving The Assumption And Assignment Of
Certain Executory Contracts And Unexpired Leases Related Thereto, And (C) Granting Related Relief*,
dated Aug. 26, 2016 (ECF Main Case Doc. # 1072).

sale, and the Sale Motion sought approval of an agreement between SunEdison and GCL (the "Stalking Horse Agreement") to sell the assets to GCL.  Under the Stalking Horse Agreement, SunEdison was required to reject the SLA and "take such actions in Korea or the United States as [GCL] may reasonably request to terminate the [SLA] (including exercising their contractual rights, pursuant to and in accordance with the terms and conditions of such agreement), and in connection with such termination, exercise any rights under the [SLA] to require SMP to promptly return all proprietary information, technology, equipment and other licensed assets to Sellers and take no actions inconsistent with the exercise of such termination. . . ."  (¶ 35.)

SMP received proper notice of the Sale Motion, (¶ 35), and in fact, filed a reservation of rights objecting to the proposed sale ("SMP Sale Objection").  (¶ 36.)  On October 25, 2016, the Court entered an order that approved the Sale Motion and Stalking Horse Agreement, and adjourned the SMP Sale Objection.  (*See Order (I) Authorizing the Sale of Solar Materials Business Free and Clear of all Liens, Claims, Encumbrances, and Interests; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granted Related*, signed Oct. 24, 2016 (ECF Main Case Doc. # 1466).)

Following Court-ordered mediation, the Court signed an order approving a settlement agreement that resolved the SMP Sale Objection (the "Settlement Agreement").  (*See Stipulated Order Approving Settlement Agreement*, signed March 27, 2017[8] (ECF Main Case Doc. # 2657).)  The Settlement Agreement permitted the sale

---

[8]    A copy of the Settlement Agreement is annexed as an exhibit to the stipulation.

to go forward while preserving the issue now before the Court.  Among other things, the Settlement Agreement required SunEdison to send a notice terminating the SLA in accordance with the terms of the SLA.  SunEdison, GCL and SMP "acknowledge and agree that SMP's rights to contest and challenge [SunEdison's] rights to terminate [the SLA] are hereby fully preserved."  (Settlement Agreement at ¶ 7.)  SMP could challenge the termination either in this Court or pursuant to arbitration under the SLA.  (*Id.*)  In consideration for these and other agreements contained in the Settlement Agreement, SunEdison agreed to pay SMP $5 million.  (*Id.* at ¶ 3.)  On March 22, 2017, the Korean Bankruptcy Court also approved the Settlement Agreement.  (¶ 37.)

## C.    The Termination and this Adversary Proceeding

SunEdison transmitted the termination notice to SMP in accordance with the Settlement Agreement on or about March 30, 2017 (the "Termination Notice").  (¶ 39.) The Termination Notice invoked the Ipso Facto Clause stating that SunEdison was terminating the SLA "as a result of SMP's pending rehabilitation proceeding and its failure to pay debts generally as they come due."  It also warned that any unauthorized use or attempt to use the intellectual property specified in the SLA would result in immediate action by SunEdison and any use of the proprietary equipment that was covered by SunEdison patents would constitute a willful infringement of SunEdison's patent rights.  (¶ 39.)  SMP received the Termination Notice in Ulsan, Korea on March 31, 2017 (Korean Standard Time).  (¶ 39.)

Post-termination, SMP filed a petition in this Court for recognition of the Korean Bankruptcy Proceeding under Chapter 15 of the Bankruptcy Code on May 1, 2017.  (*See In re SMP Ltd.*, Case No. 17-11192 (SMB).)  The Court granted recognition of the Korean

Bankruptcy Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1)

on June 15, 2017.  (*See Order Granting Recognition and Relief in Aid of a Foreign Main

Proceeding*, dated June 15, 2017 ("Recognition Order") (ECF Case No. 17-11192 Doc. #

31).)  The text of the Recognition Order engendered disagreement regarding the

language granting comity to the Korean Bankruptcy Proceeding undoubtedly in

anticipation of the pending dispute.  As reflected by the deletions and interlineations to

paragraph 4 of the Recognition Order, comity was granted to the Commencement Order

only to the extent necessary to support the findings in the Recognition Order.

Forgoing the arbitration option, SMP commenced this adversary proceeding in

this Court on May 1, 2017.  Count I of the *Complaint* seeks a judgment declaring the

SLA's Ipso Facto Clause unenforceable and SunEdison's Termination Notice invalid.

(*Complaint* at ¶ 47.)  According to SMP, Korean law renders *ipso facto* provisions in

executory contracts unenforceable against a debtor in a Korean rehabilitation

proceeding.  (*Id*. at ¶ 39.)  As a result, once the Commencement Order was entered in

SMP's Korean Bankruptcy Proceeding, SunEdison could not exercise its right to

terminate the SLA pursuant to the Ipso Facto Clause.  (*Id*. at ¶ 40.)

GCL moved for partial summary judgment on Count I on July 31, 2017.[9]  (*See

GCL Motion*.)  GCL contends that a federal court must apply the choice of law rules of

the state in which it sits, and New York's choice of law rules require a court to honor a

governing law provision in a contract absent fraud or overreaching.  (*Id*. at 7-10.)  The

---

[9]    Alternatively, the *GCL Motion* sought judgment on the pleadings as to Count I.  In light of the
factual record developed outside of the pleadings and the Court's disposition of the cross-motions for
partial summary judgment, the Court does not address GCL's motion for judgment on the pleadings.

SLA specifies that it is to be governed by New York law, and *ipso facto* clauses are enforceable in New York.  (*Id.* at 10-13.)

SMP cross-moved for partial summary judgment on Count I on August 14, 2017. (*See SMP Motion.*)  Taking a different view, SMP argues that the Court should not look to New York law to decide the matter, and instead, should apply Korean insolvency law, which renders *ipso facto* provisions in bilateral or executory contracts unenforceable against a Korean debtor.  (*Id.* at 9-13.)  According to SMP, principles of comity mandate that this Court give effect to the Commencement Order and apply Korean law.  (*Id.* at 19-29.)  In support of its argument regarding Korean insolvency law, SMP provided declarations by an expert in Korean insolvency law.  (*See Declaration of Chiyong Rim Regarding Korean Law Governing the Korean Law Dispute*, dated Aug. 14, 2017 ("*Rim Declaration*") (ECF Doc. # 29) *and Redacted Supplemental Declaration of Chiyong Rim Regarding Korean Law Governing the Korean Law Dispute*, dated Sept. 5, 2017 (ECF Doc. # 39).)  GCL responded, *inter alia*, that even if Korean law governed, the Ipso Facto Clause was not automatically unenforceable, and instead, depended on an inquiry into the facts and circumstances surrounding the termination.  (*GCL's (I) Reply in Support of its Motion for Partial Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment and (II) Opposition to SMP's Cross-Motion for Partial Summary Judgment*, dated Aug. 28, 2017 ("*GCL Reply*"), at 11-18 (ECF Doc. # 32).)  GCL also supplied an expert declaration in support of its position.  (*See Declaration of Eunjai Lee in Support of GCL's Opposition to SMP's Motion Regarding Korean Law*, dated Aug. 28, 2017 ("*Lee Declaration*") (ECF Doc. # 33).)

The Court heard oral argument on September 28, 2017 and reserved decision.[10] Although SMP appears to have the stronger argument concerning Korean insolvency law regardless of which test is applied, the Court does not decide the question in light of its disposition of the cross-motions.

## DISCUSSION

### A.    New York Law

But for the arguments relating to the effect of the Commencement Order, the resolution of this dispute would be simple and straight forward.  First, a federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits, including that state's choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941), and consequently, a bankruptcy court must apply New York's choice of law rules unless a "significant federal policy" calls for the application of a federal conflicts rule.  *Geron v. Seyfarth Shaw LLP* (*In re Thelen LLP*), 736 F.3d 213, 219 (2d Cir. 2013) (citations omitted), *answering different certified question*, 20 N.E.3d 264 (NY 2014); *Harrison v. New Jersey Cmty. Bank* (*In re Jesup & Lamont, Inc.*), 507 B.R. 452, 475 (Bankr. S.D.N.Y. 2014) ("To perform a choice of law analysis, a bankruptcy court ordinarily applies the choice of law rules of the state in which it is located.") (citations omitted).

---

[10]    SMP filed an unauthorized sur-reply after the hearing in the form of a letter, (*Letter from Jane VanLare, Esq. to the Court*, dated Oct. 2, 2017 (ECF Doc. # 47)), to which GCL objected but also responded.  (*Letter from Marshall R. King, Esq. to the Court*, dated Oct. 3, 2017 (ECF Doc. # 49).)  The Court has not considered either post-hearing submission.

Here, the parties selected New York as the governing law without regard to its conflict of law rules.[11]  Under N.Y. GEN. OBLIG. LAW § 5-1401 (McKinney 2017) ("GOL § 5-1401"), "parties to any contract . . . arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars . . . may agree that [New York law] shall govern their rights and duties in whole or in part, whether or not such contract . . . bears a reasonable relation to [New York]."  Where the parties' contract selects New York law and, as here, the amounts involved meet the monetary threshold under GOL § 5-1401, the Court must abjure a conflicts analysis or consider foreign law or foreign public policy, and must instead apply New York substantive law.  *IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 982 N.E.2d 609, 612 (N.Y. 2012) (The "plain language of General Obligations Law § 5-1401 dictates that New York substantive law applies when parties include an ordinary New York choice-of-law provision" and "[e]xpress contract language excluding New York's conflict-of-law principles is not necessary."), *cert. denied*, 133 S. Ct. 2396 (2013).

GOL § 5-1401 promotes the public policy of New York.  It recognizes that parties select New York law because its commercial law is better developed and predictable, it promotes New York's reputation as a center of international commerce and any conflicts analysis would only serve to frustrate their desire for greater certainty.  *See Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710(ER), 2013 WL 3389008, at *4 (S.D.N.Y. July 3, 2013) (Under GOL § 5-1401, "the parties' choice of law provision is enforceable, unless procured by fraud or overreaching, even if, under a traditional

---

[11]     As discussed in the succeeding text, the SLA also selected federal conflict principles but SMP did not identify or discuss any.

choice-of-law analysis, the application of New York law would violate a fundamental public policy of another, more interested jurisdiction."); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 138 (S.D.N.Y. 2000) ("Although the public policy behind China's licensing requirements is no doubt strong, [GOL § 5-1401] implicates other policies that are vitally important not only to contracting parties but also to the international community."); *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136 (RCC), 2000 WL 223838, at *2-3 (S.D.N.Y. Feb. 25, 2000) (contract meeting the requirements of GOL § 5-1401 and containing a New York choice of law provision mandated application of New York substantive law notwithstanding argument that application of New York law would violate Kuwaiti public policy); *see also IRB-Brasil Resseguros*, 982 N.E.2d at 612 ("It strains credulity that the parties would have chosen to leave the question of the applicable substantive law unanswered and would have desired a court to engage in a complicated conflict-of-laws analysis, delaying resolution of any dispute and increasing litigation expenses.").

Second, *ipso facto* clauses are enforceable under New York law absent fraud, collusion or overreaching. *W.F.M. Rest., Inc. v. Austern*, 324 N.E.2d 149, 150, 153 (N.Y. 1974) (following the dismissal of the tenant's bankruptcy, *ipso facto* clause allowing a landlord to terminate a commercial lease upon the filing of a bankruptcy petition by, or against, a tenant was enforceable absent fraud, collusion or overreaching by the landlord); *Murray Realty Co. v. Regal Shoe Co.*, 193 N.E. 164, 165 (N.Y. 1934) (enforcing *ipso facto* clause in a lease); *First Nationwide Bank v. Brookhaven Realty Assocs.*, 637 N.Y.S.2d 418, 421 (N.Y. App. Div.) ("Once the bankruptcy proceeding

terminated[,] the enforceability of that [*ipso facto*] clause was to be determined by State law and the contract between the parties."), *leave to appeal dismissed*, 670 N.E.2d 1347 (N.Y. 1996).

SMP's reliance on *dicta* in *151 W. Assocs. v. Printsiples Fabric Corp.*, 459 N.Y.S.2d 605 (N.Y. App. Div. 1983), *aff'd*, 460 N.E.2d 1344 (N.Y. 1984), (*SMP Motion* at 28), to support the contrary argument, is misplaced.  The dispute in *Printsiples* was whether the purchase of a company's unsecured claims by a third party, and transfer of equity to the same third party, constituted an "arrangement" triggering an *ipso facto* clause in a commercial lease.  *Printsiples*, 459 N.Y.S.2d at 605-07.  Three of the five justices concluded that it did not.  *Id.* at 606-07.  In *dicta*, the majority added that while section 365(e)(1) of the Bankruptcy Code[12] did not apply because the company was not in bankruptcy, that provision nonetheless showed Congress' intent "that an executory contract or unexpired lease not be terminated solely because of a lease forfeiture provision.  If such a clause is not to be given effect after the commencement of a

---

[12]    Section 365(e)(1) of the Bankruptcy Code provides:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

    (A)  the insolvency or financial condition of the debtor at any time before the closing of the case;

    (B)  the commencement of a case under this title; or

    (C)  the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

bankruptcy proceeding, there can be even less justification for doing so in the absence of a proceeding." *Id.* at 607.

Two justices dissented. In addition to concluding that the events constituted an "arrangement," *id.* at 611, they rejected the majority's invocation of federal bankruptcy law because no bankruptcy petition had been filed. *Id.* The Court of Appeals affirmed the Appellate Division's judgment but did not endorse its *dicta*. The Court concluded, as did the Appellate Division, that the "arrangement" did not trigger the *ipso facto* clause. 460 N.E.2d at 1345. It did not mention federal bankruptcy law.

As the *Printsiples* dissent argued, the Appellate Division's *dicta* regarding the effect of Bankruptcy Code § 365(e)(1) was misplaced. No court has cited *Printsiples* for the proposition that *ipso facto* clauses are unenforceable outside of bankruptcy,[13] and two reported decisions by bankruptcy courts in this circuit have disagreed with the *Printsiples dicta*. *See Comp III, Inc. v. Computerland Corp.* (*In re Comp III, Inc.*), 136 B.R. 636, 638-39 (Bankr. S.D.N.Y. 1992) ("The plaintiffs invite me to apply the *Printsiples* reasoning to the facts of this case as a matter of public policy. However enticing the invitation, I must decline, as I am of the view that where an executory contract has been terminated in accordance with its terms prior to bankruptcy, section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract.") (Brozman, J.); *In re Gordon Car & Truck Rental,*

---

[13]    The only decision affirmatively citing the majority decision in *Printsiples* that this Court could locate was *Greene Techs. Inc. v. Atoma Int'l of Am. Inc.*, which cited it for the uncontroversial proposition that section 365(e)(1) of the Bankruptcy Code precludes "the termination of an executory contract solely by operation of an ipso facto clause that terminates the contract automatically in the event of bankruptcy." 745 N.Y.S.2d 242, 243-44 (N.Y. App. Div. 2002) (emphasis omitted).

*Inc.*, 59 B.R. 956, 960 (Bankr. N.D.N.Y. 1985) (construing the pertinent language in

*Printsiples* as *dicta* and declining to adopt it).

Accordingly, under New York law, the Ipso Facto Clause is enforceable.[14]

## B.    Federal Law and Comity

The SLA's choice of law provision referred to "Federal laws of the United States"

in addition to New York law.  (¶ 22.)  That provision, however, excluded consideration of

federal choice of law rules, and moreover, SMP has not identified a different federal

choice of law rule or argued that the Ipso Facto Clause would be treated differently

under federal law.  Furthermore, the SunEdison Debtors had the statutory right to

exercise the termination right under the Ipso Facto Clause as the statutory successors to

SunEdison.  *See* 11 U.S.C. § 541(a).  Bankruptcy Code § 363(b) permitted the SunEdison

Debtors to engage in a transaction outside of the ordinary course of business after notice

and a hearing.  The Court approved the termination of the SLA twice, albeit subject to

SMP's rights.  The Stalking Horse Agreement included a provision that required

SunEdison to terminate the SLA.  The Court approved the agreement and the sale

pursuant to 11 U.S.C. § 363(b).  The Court again authorized the termination when it

---

[14]    At oral argument, SMP argued that New York's choice of law rules should not preclude SMP from
relying on Korean law because the Settlement Agreement merely established a procedure, the parties
reserved their rights, and SMP could have initiated a proceeding in Korea at an earlier time to resolve the
question, and presumably, avoid New York's conflict of laws rule.  (*Transcript of 9/28/17 H'rg* ("*9/28/17
Tr.*") at 68:8-71:19 (ECF Doc. # 48).)  While I agree that SMP preserved its rights, it does not follow that I
should disregard New York law and apply Korean law or that SMP was somehow blind-sided.  The
prospect of SunEdison's termination of the SLA dated back to the Stalking Horse Agreement, but SMP did
not seek relief from the termination in the Korean Bankruptcy Court at that time or at any subsequent
time.  Moreover, by the time the parties entered into the Settlement Agreement, it was clear that
SunEdison intended to terminate the SLA.  SMP nonetheless agreed to litigate the validity of any
termination in this forum or in an arbitration, and ultimately selected this forum.  SMP's counsel knew or
should have known that this Court would be bound to apply New York's choice of law rules under *Klaxon
Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. at 496.  Notably, the Termination Agreement did not modify the
governing law provision in the SLA.

approved the Settlement Agreement, which required SunEdison to send the Termination Notice.  Instead of pointing to any specific federal law or principle, SMP blends the contractual reference to "Federal laws" into its argument that federal principles of comity should override the SLA's choice of law provision.  (*See, e.g.*, *SMP Motion* at 27 ("The Court's consideration of Korean law is even more appropriate here where . . . the SLA's choice of law provision includes both New York *and* federal laws. Thus, even if the governing law clause did have some bearing on the Court's power grant comity—which it does not—this express provision for the applicability of 'Federal laws' plainly permits the application of federal law regarding comity.") (emphasis in original).)

Comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other.  But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895).  There are two aspects to the doctrine of comity, abstention and choice of laws, sometimes referred to respectively as "comity among courts" and "comity among nations."  *See Maxwell Commc'n Corp. plc v. Societe Generale* (*In re Maxwell Commc'n Corp. plc*), 93 F.3d 1036, 1047 (2d Cir. 1996).  The Second Circuit has explained comity abstention in favor of a foreign bankruptcy proceeding in the following manner:

> U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.  "Since '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts

regularly defer to such actions." *Finanz AG,* 192 F.3d at 246 (*quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987)); *Allstate Life Ins. Co.,* 994 F.2d at 999. In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States." *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457–59 (2d Cir.1985).

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005).

Abstention comity, or "comity among courts," is concerned with which court should decide the parties' rights, and relatedly, whether a U.S. court should enforce a foreign bankruptcy court's order relating to the debtor's assets or the adjudication of a creditor's claims. Abstention comity aims to prevent an "end-run" around the foreign bankruptcy proceeding, *see id.* at 427; *Oui Fin. LLC v. Dellar*, No. 12 Civ. 7744(RA), 2013 WL 5568732, at *10 (S.D.N.Y. Oct. 9, 2013), by a creditor seeking to collect a claim against a foreign debtor through a U.S. court proceeding instead of through the foreign bankruptcy case. *See JP Morgan*, 412 F.3d at 427-29 (abstaining from deciding a collection action in favor of a Mexican bankruptcy proceeding to resolve claim despite New York forum selection and choice of law clauses in the loan agreement); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.2d 240, 246-50 (2d Cir. 1999) (abstaining in an action brought by noteholder for payment from guarantor where guarantor was in a Brazilian bankruptcy proceeding); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 998-1000 (2d Cir.) (abstaining in securities actions brought by holders of indentures against an Austrian issuer subject to a Australian bankruptcy proceeding despite New York forum selection and choice of law provisions in the indenture agreement), *cert. denied*, 510 U.S. 945 (1993); *Victrix S.S. Co., S.A. v. Salen Dry Cargo*

*A.B.*, 825 F.2d 709, 713-15 (2d Cir. 1987) (vacating attachment obtained by creditor against a party in a Swedish bankruptcy proceeding, and explaining that the Court would "not aid [the creditor's] effort to evade the writ of the Swedish bankruptcy court"); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 456-60 (2d Cir. 1985) (same); *Oui Fin. LLC v. Dellar*, 2013 WL 5568732, at *10-12 (abstaining in an action asserting breach of contract and fraud claims against a non-debtor guarantor based on a French debtor's failure to pay a promissory note because it was an "end-run" around the foreign bankruptcy proceeding); *Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V.*, 108 F. Supp. 2d 349, 351-54 (S.D.N.Y. 2000) (abstaining in an action to collect on past-due promissory notes against debtors in Mexican bankruptcy proceedings), *aff'd*, 2 F. App'x 80 (2d Cir.), *cert. denied*, 534 U.S. 814 (2001).

SMP is not asking this Court to defer to the Korean Bankruptcy Court to decide the validity of the termination notice, and confirmed during oral argument that it was not seeking abstention and wanted me to decide the issue. (*9/28/17 Tr.* at 64:8-11.) Furthermore, both this Court and the Korean Bankruptcy Court approved the Settlement Agreement under which SMP agreed to bring its challenge to the Termination Notice in this Court or before arbitrators in accordance with the SLA, and SMP brought it here. Accordingly, there is no effort to make an "end-run" around the Korean Bankruptcy Proceeding. Nor is any party seeking to collect a claim. Although SunEdison did file a claim in the Korean Bankruptcy Proceeding, SMP has not contended that the claim resolution process will implicate the validity of the termination. Instead, SMP is asking the Court to grant comity to the Commencement Order, a subject to which I will return shortly.

As noted, the other branch of comity concerns choice of law, or "comity among nations," and can limit the reach of domestic law to conduct occurring abroad. *See Maxwell*, 93 F.3d at 1047.  SMP submits that it is not relying on comity as a principle to resolve the appropriate choice of law, (*see Reply in Further Support of SMP Ltd.'s Cross Motion for Partial Summary Judgment*, dated Sept. 5, 2017 ("*SMP Reply*"), at 6 n. 5 (ECF Doc. # 41)), and confirmed at oral argument that it did "not believe that this is a choice-of law-issue."  (*9/28/17 Tr.* at 65:5.)

In fact, this is precisely what it is.  SMP argues that the Court should grant comity to the Commencement Order by which it means give extraterritorial effect to all of the Korean insolvency law.  It cites several cases in support of this proposition, but they are distinguishable.  For example, in *In re Daebo Int'l Shipping Co.,* 543 B.R. 47 (Bankr. S.D.N.Y. 2015), Daebo commenced a bankruptcy proceeding in Korea pursuant to the DRBA.  The DRBA authorizes a Korean court to issue a stay order preventing creditors from executing against the debtor's assets or taking actions to collect their claims against the debtor.  *Id.* at 49.  The Korean bankruptcy court issued such an order in accordance with the DRBA that *expressly* stayed creditors from enforcing or executing on their rehabilitation claims pending the court's determination of Daebo's application to commence rehabilitation proceedings.  *Id.* at 50.

Five Daebo creditors subsequently filed maritime attachment proceedings in Louisiana federal district court against a vessel, the TRADER, to obtain *quasi-in-rem* jurisdiction to litigate their unsecured claims against Daebo.  *Id.* at 50-51.  After the Louisiana federal district court declined to vacate the attachments, Daebo commenced a chapter 15 case in this district, and sought an order vacating the attachments.  *Id.* at 52.

- 20 -

The principle issue was whether Daebo owned or merely leased the TRADER. The TRADER was ostensibly leased to Daebo pursuant to a sale-and-leaseback transaction, but the attaching creditors argued that the transaction was a secured loan and Daebo was the true owner of the TRADER. *Id.* The parties stipulated that the Bankruptcy Court could decide the validity of the attachments. *Id.* They further stipulated or agreed that the Korean stay order barred any creditor from taking any action against Daebo's assets, that the Korean court had worldwide jurisdiction over Daebo's assets and its creditors' claims although the attaching creditors subsequently insisted that the stay order did not have effect outside of Korea, and that to the extent that the TRADER belonged to Daebo, the attachments should be vacated. *Id.* at 53.

The Bankruptcy Court concluded that the DRBA and the stay order were "clear," the stay order had worldwide effect, and it was consistent with the purposes of chapter 15 to give them effect. *Id.* at 54. It noted that U.S. creditors could file claims in the Korean proceeding. *Id.* It next ruled that to the extent the attachments were directed at Daebo's property, they were barred by the stay order and the DRBA and should be lifted as a matter of comity. *Id.* at 55. Since the attaching creditors agreed that Daebo was the true owner of the TRADER, the attachments had to be vacated in light of the stay order. *Id.* Furthermore, it appeared to the Bankruptcy Court that the Korean court was essentially treating the transaction as a secured loan. *Id.* at 56. The Bankruptcy Court rejected the attaching creditors' other theories, and vacated the attachments. *Id.* at 59.

In *Daebo*, the Bankruptcy Court granted comity to a specific Korean stay order that prevented creditors from seizing the debtor's assets, and required them to file claims in the Korean proceeding to effect a payment. This result is entirely consistent

with the principles underpinning abstention comity. Other cases cited by SMP in addition to those already noted similarly granted comity to the express orders of a foreign bankruptcy court that dealt with the claims administered in the foreign proceeding. *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 698-700 (Bankr. S.D.N.Y. 2010) (granting comity to an approved Canadian plan of reorganization that specifically provided for third-party non-debtor releases); *Barclays Bank PLC v. Kemsley*, 992 N.Y.S.2d 602, 609 (N.Y. Sup. Ct. 2014) (granting comity to U.K. debtor's discharge order, which "by its terms, released [the debtor] from all of his debts").

In contrast, the Commencement Order appoints a custodian and sets schedules but does not contain any language that prevented SMP from terminating the SLA. SMP contends that the "silent" Commencement Order automatically sweeps in every aspect of Korean insolvency law, this Court must apply Korean insolvency law, including Korean common law,[15] and invalidate the Termination Notice because the Korean custodian wants to perform the SLA. This argument raises an interesting question. At oral argument, the Court asked SMP's counsel whether, if the situation were reversed, Korean law would preclude SunEdison from assuming the SLA if the Korean custodian wanted to terminate it. (*9/28/17 Tr.* at 62:11-17; 62:20-63:1.) Ultimately, SMP's counsel confirmed that notwithstanding U.S. bankruptcy and New York law, this Court should recognize the Korean custodian's right, triggered by, but not mentioned in, the Commencement Order, to make the decision to perform or terminate the SLA granted under Korean law. (*9/28/17 Tr.* at 67:7-24.)

---

[15]     *See Rim Declaration* at ¶ 15 ("Unlike the United States Bankruptcy Code, [Korean bankruptcy law] does not have an express provision on the enforceability of a bankruptcy termination clause.").

SMP has not provided support for the remarkable proposition that SMP's Korean Bankruptcy Proceeding sweeps in the entirety of Korean insolvency law under principles of international comity, and trumps U.S. bankruptcy and state law.  *Daebo*, which it cites for this proposition, (*see SMP Reply* at 6), did not so hold; it granted comity to DRBA to the extent the DRBA authorized the issuance of the stay order.  Moreover, the parties selected New York law to govern their contractual rights, and the application of Korean law ignores that choice and their presumed expectations.  As the English High Court recently observed in a case involving similar facts and issues regarding the effect of Korean insolvency law on an *ipso facto* clause valid under English law, while the parties "might have expected that a Korean court would apply Korean insolvency law to the insolvency of the Company, they might have been very surprised to find that an English court would apply Korean insolvency law to the substantive rights of the parties under a contract which they had agreed should be governed by English law."  *In re Pan Ocean Co. Ltd* [2014] EWHC 2114 (Ch), at ¶ 112, 2014 WL 2807873 (2014).[16]

For the reasons stated, I decline in the exercise of discretion to grant comity to the Commencement Order to the extent advocated by SMP.  Accordingly, GCL's motion for partial summary judgment is granted, and SMP's motion for partial summary judgment is denied.  Settle order on notice.

Dated:  New York, New York
      October 13, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court

---

[16]    The Westlaw report does not include the paragraph numbers that appear in the printed decision. The printed version of the opinion is annexed to the *Lee Declaration* as Exhibit I.